# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MARIBETH N.,[1]
    *Plaintiff*,

    v.

MICHELLE KING, ACTING
COMMISSIONER OF SOCIAL
SECURITY,[2]
    *Defendant.*

No. 3:24-cv-212 (VAB)

## RULING AND ORDER ON MOTION TO REVERSE THE DECISION OF THE COMMISSIONER AND MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

Maribeth N. ("Plaintiff" or "Claimant") has filed this administrative appeal under 42

U.S.C. § 405(g) against Michelle King, the Acting Commissioner of Social Security

("Defendant" or "the Commissioner"), seeking to reverse the decision of the Social Security

Administration denying her claim for Title II Disability Insurance Benefits ("DIB"), or, in the

alternative, to remand the case for a new hearing. Mot. to Reverse Decision of the Comm'r, ECF

No. 15-1 (Jun. 14, 2024).

The Commissioner has moved to affirm the decision. Def.'s Mot. for an Order Affirming

the Decision of the Comm'r, ECF No. 21-1 (Sept. 18, 2024).

For the reasons explained below, Maribeth N.'s motion is **GRANTED** and the

---

[1] In opinions issued in cases filed under § 405(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial in order to protect the privacy interests of social security litigants while maintaining public access to judicial records. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).
[2] Michelle King became the Acting Commissioner of Social Security on January 20, 2025. Under Rule 25(d) of the Federal Rules of Civil Procedure, Michelle King should be substituted for Martin O'Malley as the Defendant in this suit. No further action need be taken. 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

Commissioner's motion is **DENIED**.

The decision of the Commissioner is **VACATED** and **REMANDED** for rehearing and further proceedings in accordance with this Ruling and Order.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background[3]

1. Medical History

Born on January 23, 1991, Maribeth N. was 30 years old at the time of her alleged onset date of disability of July 6, 2021, and when she submitted her application for disability and disability insurance benefits on September 26, 2021. Social Security Transcripts, ECF No. 11 at 27 (Apr. 11, 2024) ("Tr.").[4] In her application, Maribeth N. claimed that her spinal fusion, depression, arthritis, and anxiety limited her ability to work. Tr. at 180.

#### a.  Medical Conditions and Diagnoses

Maribeth N. completed high school and previously worked as a "cashier, cook, crew member, customer service [worker], and electronics sale representative and stocker." *Id.* at 248.

Maribeth N. suffers from bilateral pars defect[5] at L5-S1, and obesity which exacerbates her back pain. *See id.* at 483. On April 27, 2021 and April 28, 2021, MRIs of her spine showed "[g]rade 1 anterolisthesis of L5 on S1 due to bilateral pars defects" and "moderate to severe bilateral neural foraminal narrowing" at L5-S1. *Id.* at 737–38, 785–86. On June 3, 2021, Dr.

---

[3] The summary below focuses on the aspects of Maribeth N.'s medical history highlighted in the parties' briefings, *i.e.*, her back injury and the pain she experiences as a result of this injury, and is not intended to be a complete recitation of Maribeth N.'s lengthy treatment record and conditions described therein.

[4] Where the internal pagination of the transcript conflicts with the ECF-generated pagination, this Opinion refers to the ECF-generated pagination.

[5] A pars defect, or spondylolysis, is a stress fracture in the spine. Mem. at 16 n.15 ("A pars defect is a stress fracture"); Opp'n at 2 n.2 (Spondylolysis. Pars defect. Stress fracture. These three terms are used interchangeably, all referring to the same condition. Spondylolysis is a stress fracture through the pars interarticularis of the lumbar vertebrae. The pars interarticularis is a thin bone segment joining two vertebrae. It is the most likely area to be affected by repetitive stress. This condition is fairly common and is found in one out of every 20 people.")

David Spiro examined Maribeth N. and noted that she claimed to have a "longstanding history of lower back pain" that began "approximately 5 years ago" when she slipped at work. *Id.* at 346. Maribeth N. "describe[d] her lower back pain as a constant pain that radiates across her lower back, upper part of lumbar region, left buttock, left groin, and wraps around her left thigh" and reported that "[h]er pain exacerbates with prolonged sitting, standing, and walking." *Id.* Dr. Spiro noted an antalgic gait, and 5/5 motor strength across Maribeth N.'s upper and lower extremities, with the exception of her left plantar flexion, which was reported to have 4+/5 strength. *Id.* at 351. Dr. Spiro diagnosed Maribeth N. with "grade 1 spondylolisthesis with severe loss of disc height and bilateral foraminal stenosis" and recommended that she undergo surgery. *Id.* at 352.

On July 8, 2021, Dr. Spiro performed transforaminal lumbar interbody fusion surgery.[6] *Id.* at 292.

At her post-surgery appointments in July and August 2021, Maribeth N. reported that while her "pain and numbness in the left lower extremity have resolved" she "continue[d] to experience some back pain" and "left leg still feels weak compared to the right," and also reported new numbness in her right thigh. *Id.* at 353, 358; *see also id.* at 359 (on 8/16/2021, Maribeth N. "states symptoms in her left lower extremity have completely resolved," "still complains of back pain, that varies on a day-to-day basis," "felt a grinding/clunking sensation in her low back," and "complains of residual numbness in the region of the right anterior thigh."); *id.* at 367 (on 8/25/2021 "[s]he has not experienced any change in her symptoms including increased pain, numbness/tingling or weakness."). Marena Harrison, PA, opined that "[t]hese

---

[6] "Transforaminal lumbar interbody fusion (TLIF) is a spinal fusion technique for the lower back, in which two spinal bones (vertebrae) are joined by removing a portion of the spinal disc between them and placing a spacer (cage), supplemented by screws and rods, in its place. Removing the disc and fusing the vertebrae eliminates motion in that spinal segment (meaning two vertebrae and the intervertebral disc) and reduces back pain. Placing a spacer reduces compression on the nerves by giving them more room. This alleviates sciatica back and leg pain." Mem. at 18 n.17.

symptoms are likely due to positioning during surgery, and should improve over time." *Id.* at 358. At all three appointments, no antalgic gait was observed, and her motor strength was assessed 5/5 on both her right and left extremities. *Id.* at 358, 365–66, 372–73. Maribeth N. was referred to physical therapy. *Id.* at 366.

From August 31, 2021, to May 23, 2022, Maribeth N. attended regular physical therapy at Johnson Memorial Hospital.[7] At her sessions, Maribeth N. reported continued back pain and difficulty walking, bending, and squatting. *See id.* at 392 ("Treating diagnosis . . . Difficulty in walking"); *id.* at 395 ("[Patient] reports the back is sore and feels best when sitting."); *id.* at 422 ("[Patient] reports the back is hurting today with some pain in the left knee."); *id.* at 445 ("[Patient] reports the back is hurting today"); *id.* at 450 ("[Patient] demonstrates fatigue throughout [treatment] session."); *id.* at 461 ("Continued pain with increased activity such as stairs and bending/squatting."); *id.* at 464 ("Limitations continue with stair negotiation, lifting/carrying, bending/squatting, work activities, and household chores."); *id.* at 571 ("Pain continues with standing and ambulation."); *id.* at 579 ("[Patient] reports pain in the left knee and back."); *id.* at 636 ("[Patient] reports she is still having pain."); *id.* at 644 ("[Patient] continues to have pain and discomfort"); *id.* at 652 ("[Patient] reports continue[d] pain in the back. [Patient] very frustrated."); *id.* at 660 ("Constant pain and discomfort."); *id.* at 681 ("[Patient] continues to have pain in the lumbar region as well as the anterior thighs."). Her sessions, however, were

---

[7] *Id.* at 386–93 (Aug. 31, 2021); 394–96 (Sept. 2, 2021); 397–400 (Sept. 8, 2021); 401–04 (Sept. 11, 2021); 405–08 (Sept. 15, 2021); 409–12 (Sept. 19, 2021); 413–16 (Sept. 22, 2021); 417–19 (Sept. 26, 2021); 421–24 (Sept. 29, 2021); 425–31 (Oct. 3, 2021); 432–35 (Oct. 18, 2021); 444–47 (Oct. 25, 2021); 448–51 (Nov. 1, 2021); 456–58 (Nov. 5, 2021); 460–67 (Nov. 9, 2021); 570–73 (Dec. 5, 2021); 574–77 (Dec. 8, 2021); 578–81 (Dec. 12, 2021); 582–86 (Dec. 14, 2021); 587–90 (Dec. 16, 2021); 591–94 (Dec. 20, 2021); 596–98 (Dec. 22, 2021); 605–08 (Jan. 4, 2022); 609–15 (Jan. 6, 2022); 616–19 (Jan. 13, 2022); 623–26 (Jan. 18, 2022); 628–31 (Jan. 23, 2022); 631–35 (Jan. 25, 2022); 635–39 (Jan. 28, 2022); 639–42 (Feb. 1, 2022); 642–49 (Feb. 3, 2022); 651–54 (Mar. 2, 2022); 654–57 (Mar. 8, 2022); 659–65 (Mar. 14, 2022); 666–68 (Mar. 20, 2022); 671–73 (Mar. 23, 2022); 674–677 (Mar. 30, 2022); 678–81 (Apr. 6, 2022); 682–85 (Apr. 11, 2022); 685–692 (Apr. 13, 2022) 693–95 (May 2, 2022); 696–99 (May 4, 2022); 700–03 (May 9, 2022); 703–08 (May 11, 2022); 712–15 (May 19, 2022); 715–18 (May 23, 2022).

reported to have improved her pain symptoms and functional capacities. *See, e.g., id.* at 415 ("[Patient] demonstrates decreased pain with manual techniques"); *id.* at 425 ("improved [symptoms] . . . and walking 20 mins"); *id.* at 614 ("[Patient] demonstrates improved standing posture and ambulation following [treatment] session."); *id.* at 676 ("[Patient] tolerated [treatment] session well with some decrease in pain.").

During her sessions, Maribeth N. told her physical therapist that she would babysit her nieces, *id.* at 449 ("[Patient] helping her sister with her new born"), although she reported that on some occasions, this would worsen her back pain. *See, e.g., id.* at 414 ("[Patient] reports she had to stop her niece from driving a power wheels into the street causing increased back pain for the past couple of days."). In addition, she mentioned that she took a five-hour trip to Buffalo during the Christmas holidays and suffered increased pain after the travel. *See id.* at 597 ("[Patient] reports back pain and a 5 hour trip to Buffalo tomorrow."); *id.* at 606 ("[Patient] reports more pain in the back after traveling to Buffalo for Christmas.") .

On December 28, 2021, at an appointment with Patricia Nugent, PA, Maribeth N. reported chronic lower back pain, "burning pain in [her] feet over [the] past month," "occasional nausea associated with back pain" and chronic fatigue. *Id.* at 600.

On January 25, 2022, during her physical therapy appointment, Maribeth N. was "recommended to call surgery due to consistent pain." *Id.* at 634. Her physical therapist noted that while she "does get relief with [physical therapy] . . . the pain returns the day after [physical therapy]." *Id.*

On February 2, 2022, x-rays of Maribeth N.'s spine showed "[c]hronic disc space surgery and fusion at LS-S1" and "[c]hronic spondylolisthesis."[8] *Id*. at 783.

---

[8] "Spondylolisthesis is commonly referred to as a slipped disc." Mem. at 16 n.15.

On February 18, 2022, at the request of the Disability Determination Services ("DDS"), Michele Krynski, PhD, conducted a mental health examination of Maribeth N. *Id.* at 472–77. Maribeth N. stated that from age twenty-six, she has smoked marijuana on a daily basis for pain management. *Id.* at 475. She further stated that "on a typical day she babysits her three-months-old niece when her sister drops her off," and that "she also provides care for her three-year-old niece when her niece is not in school." *Id.* at 476.

On March 20, 2022, Maribeth N.'s physical therapist, Mark McAuliffe, observed that she had a "[p]oor gait pattern." *Id.* at 667. Later, on April 11, 2022, he observed that Maribeth N. demonstrate[d] increased tenderness" during her session. *Id.* at 684.

On April 26, 2022, Maribeth N. met with Dr. Bruce Chozick and reported "pain and numbness in both anterior thighs and groins" since her surgery, "feel[ing] off balance when walking" and "trouble sleeping due to discomfort." *Id.* at 745. She also reported that physical therapy did not help her. *Id.* Dr. Chozick ordered a lumbar CT scan, id., which showed "[c]hronic postsurgical changes at L5-S1, [c]hronic spondylolisthesis" and no fusion of the endplates. *Id.* 741–42, 755. Dr. Getz concluded that the scans showed "no bony fusion" and a "remaining right L5 lamina with a pars defect." *Id.* at 750. Dr. Chozick observed that Maribeth N.'s gait was "intact" at her visit. *Id.* at 752. Dr. Chozick recommended that Maribeth N. undergo an "evaluation at the pain clinic for possible cortisone injections." *Id.* at 757.

On June 13, 2022, and June 16, 2022, Maribeth N.'s MRIs showed "[i]nterval L5-S1 posterior fusion without complications" and "[n]o residual canal or foraminal stenosis," *id* at 744, 753, though "mild residual anterolisthesis of LS on S1 vertebra" was observed. *Id.* at 743, 753. Upon reviewing Maribeth N.'s MRI results, Dr. Chozick recommended that she be evaluated at the pain clinic for cortisone injections. *Id* at 757.

On July 14, 2022, anesthesiologist Dr. Mark Spencer consulted Maribeth N. regarding pain management, and diagnosed her with lumbar post laminectomy syndrome.[9] *Id.* at 763. Maribeth N. reported that she was experiencing "low back pain radiating up the mid back to the neck" and "numbness which radiates into the anterior thighs." *Id.* at 758. She further reported that "the pain is always present" and that she took "2 regular strength Tylenol in the morning and 2 at night." *Id.*

After this consultation, Dr. Spencer administered several pain management treatments. On July 25, 2022, Dr. Spencer performed a steroid epidural lumbar injection to Maribeth N.'s lumbar region. *Id.* at 770. On August 11, 2022, Dr. Spencer prescribed Maribeth N. with trial gabapentin and a second caudal epidural injection. *Id.* at 768. On August 22, 2022, after Maribeth N. reported continued pain to her right leg and foot, Dr. Spencer administered a second epidural injection, *id.* at 776–78, and on October 7, 2022, a third injection. *Id.* at 824. On October 27, 2022, Maribeth N. reported to Dr. Spencer that she experienced "4 days of 90% pain relief" after the injection, but "the pain has returned [and] she has pain in the low back radiating into both hips and both legs." *Id.* at 831. She further reported taking Tylenol twice daily and gabapentin at night. *Id.* Dr. Spencer increased her gabapentin to include a morning dose. *Id.*

### b.  Medical Opinions and Assessments

There are three medical opinions in the records that are relevant to the parties' briefs.

First, on February 26, 2022, at the request of DDS, Dr. Steven Weisman completed a physical exam and concluded that Maribeth N. was "able to sit, stand, and walk for up to 4 hours in an 8 hour day," "to perform manipulative activity on a frequent basis," and "to lift or carry 10 lb occasionally" but was "unable to perform postural activity" or "to carry any weight on a

---

[9] "Post-laminectomy syndrome, sometimes called failed back syndrome or failed back surgery syndrome, is a condition characterized by chronic back or neck pain following surgery." Mem. at 18 n.16.

frequent basis." Tr. at 483. Dr. Weisman reported that Maribeth N. cooked, shopped, and performed childcare, and was "able to shower by herself and dress herself." *Id.* at 481. He further reported that her gait was "wide based, slow, and steady" but she was "unable to squat. . .[,] mount or dismount exam table without assistance[,] or rise from chair without difficulty." *Id.*

Second, on March 21, 2022, state agency consultative physician Dr. Virginia Thommen completed an opinion concluding that Maribeth N. was capable of light work. Dr. Thommen found that Maribeth N. could frequently lift or carry ten pounds, occasionally lift or carry twenty pounds, and could stand, walk, or sit, a total of six hours in an eight-hour workday. *Id.* at 71. Dr. Thommen also concluded that Maribeth N. could frequently climb ramps/stairs, kneel, and crouch, and occasionally climb ladders, stoop, or crawl. *Id.* Dr. Thommen did not examine Maribeth N., but rather based her findings on Maribeth N.'s overall medical history. *Id.* at 72.

Third, on July 26, 2022, state agency physician Anita Bennett likewise concluded that Maribeth N. was able to perform light work, and could frequently lift or carry ten pounds, occasionally lift or carry twenty pounds, and could stand, walk, or sit, a total of six hours in an eight-hour work day. *Id.* at 79. Dr. Bennett also found that Maribeth N. could frequently climb ramps/stairs, and kneel, and occasionally climb ladders, stoop, or crawl, but, unlike Dr. Thommen, Dr. Bennett found that Maribeth N could only occasionally crouch. *Id*. Dr. Bennett noted that while Maribeth N "has [claims of] persistent pain, [her] exams show no evidence of nerve root compression and recent MRI of L spine shows no disc herniation, canal or foraminal stenosis, or complication from her procedure[,]" and "[s]he has a normal gait on recent exams." *Id.* at 80.

2. <u>Disability Application</u>

On September 29, 2021, Maribeth N. applied for disability and disability insurance

benefits and alleged an onset date of disability as of July 6, 2021. *Id.* at 17. Her claims were

denied initially on March 24, 2022, and again on July 28, 2022, upon reconsideration. *Id.*

On January 12, 2023, Administrative Law Judge John Aletta (the "ALJ") held a hearing

in which Maribeth N. gave testimony, as well as a vocational expert, Lynn Paulson. *Id.*

During the hearing, Maribeth N. stated that she cannot work because she has a "broken

back." *Id.* at 42. She testified that before her surgery in July 2021, she called out of work or left

early from work four times a week, *id.* at 48, "because she was not able to "get to [her] car or get

into [her] car." *Id.* at 47. She also testified that she was unable to perform tasks at work such as

"bend[ing] over, wip[ing] tables, lean[ing] out the window, wip[ing] floors, clean[ing] floors,

tak[ing] out trash, [and] lift[ing] frozen product into the freezer." *Id.* She stated that before her

surgery, she had pain in both legs, though "more so [in her] left than [her] right." *Id.* at 48.

Maribeth N. also testified that her spinal fusion surgery "failed," *id.* at 42, and Dr.

Chozick had informed her that the artificial disk placed during her surgery was not placed in the

right spot. *Id.* at 48. She claimed that after her surgery she continued to have "extreme" chronic

pain in both extremities, more so on her left side. *Id.* at 48–49. In response to the ALJ's

questions, she stated that she previously took Gabapentin for pain management without side

effects, and later switched to Lyrica, which caused her to be hospitalized. *Id.* at 42–43. When

questioned by counsel, Maribeth N. claimed that she experienced side effects from Gabapentin

such as drowsiness, sleepiness, tiredness, and exhaustion. *Id.* at 51. She also testified that her

physical therapy at Johnson Memorial Hospital did not reduce her pain or increase her

functionality. *Id.* at 54. She further claimed that her physician, Dr. Chozick, informed her that

she would require corrective surgery. *Id.* at 50.

As for her functional abilities, Maribeth N. stated that she could lift a gallon of milk, could not fully bend over, and had difficulty standing or walking for long periods of time. *Id.* at 43. She testified that she could walk, at most, ten minutes at a time, and that she could not sit for longer than five minutes at a time without needing to change positions or lie down. *Id.* at 51. She also claimed that her mother prepares her food, and that she does not perform any cleaning, laundry, or outdoor work, and is not able to do her own personal hygiene, bathroom, and shower activities. *Id.* at 43–44. She testified that she needs assistance putting on clothing and uses a shower seat, although she is able to use the toilet on her own. *Id.* at 53. She further testified that she goes to the grocery store "[j]ust to get of the house to walk for five minutes a day," visits her sister at her sister's house, and attends church on Sundays. *Id.* at 45–46. Maribeth N. claimed that she sleeps for much of the day because of the medication. *Id.* at 45. Maribeth N. also testified that she had not left Connecticut for any reason since July 2021. *Id.* at 46.

Vocational expert Lynn Paulson then stated that an individual with Maribeth N.'s conditions[10] could perform the job of merchandise marker, office helper, and inspector and hand packager. Tr. at 56. The vocational expert further testified that if the individual were off task 15% of the time, or absent from work (including coming in late, or leaving early) two times per month, there would be no jobs that she could perform. *Id.* at 60–61. When examined by Maribeth N.'s counsel, Ms. Paulson testified that if the individual could not sit, stand, and walk for up to four hours, there would be no competitive employment, nor would the individual be able to perform these jobs if they could not stoop, kneel, bend, crouch, or crawl. *Id.* at 61–62.

---

[10] The ALJ presented the hypothetical of an individual of Maribeth N.'s age, education, and experience who "can frequently climb ramps and stairs, can occasionally climb ladders, ropes, or scaffolds, can occasionally stoop, occasionally kneel, occasionally crouch, and occasionally crawl," "cannot work at unprotected heights," and "could stand and walk up to four hours during each eight-hour workday." Tr. at 55, 57.

3. <u>ALJ Decision</u>

On April 5, 2023, the ALJ affirmed the denial of Maribeth N.'s claims. Tr. at 17. The
ALJ determined that Maribeth N. remained insured through June 30, 2024. *Id.* at 19.

At Step One, the ALJ found that Maribeth N. did not engage in substantial gainful
activity since her alleged onset date of July 6, 2021. *Id.*

At Step Two, the ALJ found that since her alleged onset date of July 6, 2021, Maribeth
N. had the following severe impairments: lumbar degenerative disc disease with bilateral pars
defect at L5-S1 and spondylolisthesis status/post fusion, post-laminectomy syndrome and
obesity. *Id.* at 20.

At Step Three, the ALJ determined that Maribeth N. did not have an impairment or
combination of impairments that met or medically equaled the severity of one of the listed
impairments in 20 CFR, Part 404, Subpart P, Appendix 1. *Id*. at 21.

At Step Four, the ALJ found that Maribeth N. had the residual functional capacity to
perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except that she was
unable to work at unprotected heights, and could "stand [or] walk for four hours during each
eight-hour workday[, could] frequently climb ramps and stairs[, could] occasionally climb
ladders, ropes, or scaffold[, and could] occasionally stoop, kneel, crouch, and crawl." *Id.* at 22

In making this determination, the ALJ noted that while "the objective and clinical
evidence reviewed above does support [Maribeth N.'s] allegations of chronic back pain since her
alleged disability onset date[,] [t]he medical evidence, and objective, clinical findings noted in
those records are not consistent with the intensity of symptoms and degree of functional
limitations that [Maribeth N.] has alleged in her statements and testimony." *Id.* at 25. In
particular, the ALJ considered that "the lumbar MRI in June 2022 found no evidence of residual

central canal or neural foraminal stenosis" and that, post-surgery, Maribeth N. was "never observed to appear uncomfortable or in distress by her treating medical providers during her examinations." *Id.* The ALJ also found that her daily activities, which included babysitting her three-month-old niece daily and her three-year-old niece "when her niece is not in school" and the fact that Maribeth N. "was able to travel round-trip from her home in Connecticut to Buffalo, New York over the Christmas holiday" indicate that Maribeth N.'s residual functional capacity were "significantly greater than she asserted during her testimony at the hearing." *Id.*

The ALJ found the opinions of state agency medical consultants, Dr. Thommen and Dr. Bennett to be "somewhat persuasive," and agreed with their opinions regarding Maribeth N.'s lift, carry, and sitting abilities. He concluded, however, that "the evidence supports greater limitation in stand/walk, slightly different postural limitations, and an environmental limitation regarding unprotected heights." *Id.* at 26. The ALJ did not find Dr. Weisman's opinion to be persuasive because it was "not consistent with and supported by [Maribeth N.]'s longitudinal treatment records and objective/clinical findings" and was "based solely on a one-time examination of the claimant and the claimant's presentation at the appointment because he did not have the opportunity to review any of her treatment records in formulating his opinion." *Id.*

At Step Five, the ALJ found that Maribeth N. had no past relevant work, and thus transferability of job skills was not an issue. *Id.* at 27. The ALJ further determined that, considering Maribeth N.'s age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could have performed, such as merchandise maker, office helper, and storage facility rental clerk. *Id.* at 28.

Accordingly, the ALJ determined that Maribeth N. was not disabled as defined in the Social Security Act. *Id.* at 29.

Following an unsuccessful appeal to the Appeals Council, which was denied on January 26, 2024, *see id.* at 1, Maribeth N. appealed to this Court, *see* ECF No. 1 (Feb. 16, 2024).

### B.  Procedural History

On June 14, 2024, Maribeth N. filed a motion seeking the reversal of the decision of the Commissioner. Mot. to Reverse Decision of the Comm'r, ECF No. 15; Mem. in Supp. of Mot. to Reverse, ECF No. 15-1 ("Mem.").

On September 18, 2024, the Commissioner filed a motion to affirm the decision of the Commissioner. Mot. to Affirm the Decision of the Comm'r, ECF No. 21; Mem. in Supp. of Mot. to Affirm the Decision of the Comm'r, ECF No. 21-1 ("Opp'n.").

On October 2, 2024, Maribeth N. filed a response to the Commissioner's motion. Resp. to Def.'s Mot. to Affirm, ECF No. 22 ("Reply").

## II.    STANDARD OF REVIEW

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on the correct legal standard." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 405(g)).

Substantial evidence is "more than a mere scintilla." *Brault v. Comm'r of Soc. Sec.*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). It is generally "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brown v. Apfel*, 174 F.3d 59, 61 (2d Cir. 1999) (internal quotation marks omitted)

(citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). To determine "whether the agency's findings are supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

When "the Commissioner's decision applies the correct legal principles and is supported by substantial evidence, that decision will be sustained." *Kumar v. Berryhill*, No. 3:16-cv-1196 (VLB), 2017 WL 4273093, at *4 (D. Conn. Sept. 26, 2017) (citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)). On the other hand, "[a]n ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case." *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020) (citing *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). A court generally need not remand a case if the ALJ only committed harmless error, such that "application of the correct legal principles to the record could lead only to the same conclusion." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## III.    DISCUSSION

In order to be entitled to benefits under the Social Security Act, a plaintiff must demonstrate that they have a disability, defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). This determination is made through a five-step evaluation.

First, the ALJ must determine whether the claimant is engaged in substantial gainful activity. *Id.* § 404.1520(b).

If they are not engaged in such activity, the ALJ must proceed to Step Two to determine whether the claimant has a severe medically determinable impairment or combination of impairments. *Id.* § 404.1520(c). An impairment will be considered severe if it significantly limits a claimant's ability to perform "basic work activities." *Id.*

If the claimant has a medically determinable severe impairment, then the ALJ proceeds to Step Three to determine whether any identified severe impairments meet or medically equal those identified in Appendix 1. *Id.* § 404.1520(d). These impairments are *per s*e disabling, assuming a claimant meets the duration requirement. *Id.*

If the claimant's impairments are not *per se* disabling, then the ALJ proceeds to Step Four, which entails assessing the claimant's residual functional capacity ("RFC"), or their ability to work in light of their limitations. *Id.* §§ 404.1520(a)(4)(iv), 404.1520(e), 404.1545(a)(1).

At Step Five, the ALJ must establish whether the claimant's residual functional capacity will allow the performance of any past relevant work. If the claimant is unable to perform past relevant work, the ALJ bears the burden of proving that, accounting for the claimant's age, education, work experience, and residual functional capacity, the claimant can perform other work that exists in significant numbers in the national economy. *Id.* § 404.1520(g)(1). If the ALJ proves all of that, then the claimant is not disabled. *Id.*

The claimant bears the burden of proving the requirements of Steps One through Four, after which the burden shifts to the Agency to prove that the claimant is capable of working. *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) ("The burden is on the claimant to prove that he is disabled within the meaning of the Act . . . . However, if the

claimant shows that his impairment renders him unable to perform his past work, the burden then shifts to the Secretary to show there is other gainful work in the national economy which the claimant could perform.").

### A.  Whether the ALJ Sufficiently Developed the Administrative Record

"A claimant's RFC is 'the most [she] can still do despite [her] limitations.'" *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quoting 20 C.F.R. § 416.945(a)(1)). As stated above, the ALJ determined that Maribeth N. "has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) with the following additional limitations: She can stand/walk for four hours during each eight-hour workday; can frequently climb ramps and stairs; can occasionally climb ladders, ropes, or scaffold; can occasionally stoop, kneel, crouch, and crawl; and cannot work at unprotected heights." Tr. at 22. While not raised in the parties' briefs, the Court will first consider whether the ALJ should have further developed the record by seeking to obtain an additional medical opinion from a medical professional who personally evaluated Maribeth N, such as one of her treating physicians, regarding her RFC.

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). "[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel.'" *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (quoting *Perez*, 77 F.3d at 47). "The ALJ must seek additional evidence or clarifications from medical sources when documentation in the record is insufficient to determine whether the claimant is disabled." *Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-0502 (AJN) (KHP), 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted sub nom. Cuevas v. Comm'r of*

*Soc. Sec.*, No. 20CV0502KMWKHP, 2022 WL 717612 (S.D.N.Y. Mar. 10, 2022) (citing

*Sanchez v. Comm'r of Soc. Sec.*, No. 18-cv-2027 (KMK), 2019 WL 4673740 at *8 (S.D.N.Y.

Sept. 25, 2019)). On the other hand, "where there are no obvious gaps in the administrative

record, and where the ALJ already possesses a complete medical history, the ALJ is under no

obligation to seek additional information in advance of rejecting a benefits claim." *Rosa*, 168

F.3d at 79 (internal quotation and citation omitted).

"Whether the ALJ has satisfied this duty to develop the record is a threshold question"

that the Court must consider "[b]efore determining whether the Commissioner's final decision is

supported by substantial evidence." *Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 577 (S.D.N.Y.

2022); *see also Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not

supported by substantial evidence but because the ALJ should have developed a more

comprehensive record before making his decision.").

While the "Treating Physician Rule"[11] does not apply to claims filed after March 27,

2017, *see* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844,

5867–68 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c, "despite the new regulations, an

ALJ's duty to develop the record takes on heightened importance with respect to a claimant's

treating medical sources, because those sources are likely to be the medical professionals most

able to provide a detailed, longitudinal picture of a claimant's medical impairment(s) and may

bring a unique perspective to the medical evidence that cannot be obtained from the objective

medical findings alone or from reports of individual examinations." *Jackson*, 588 F. Supp. 3d at

---

[11] The "Treating Physician Rule" gives "deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). Under this rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).

583 (internal citations and quotations omitted). Even "[u]nder the new [SSA] regulations, '[a] survey of . . . cases . . . show[s] that while the treating physician's rule was modified, the essence of the rule remains the same, and the factors to be considered in weighing the various medical opinions in a given claimant's medical history are substantially similar.'" *Ting v. Comm'r of Soc. Sec.*, No. 23-CV-1241 (PKC), 2024 WL 815841, at *7 n.12 (E.D.N.Y. Feb. 27, 2024) (quoting *Acosta Cuevas*, 2021 WL 363682, at *9 (citations omitted), *report and recommendation adopted*, 2022 WL 717612 (S.D.N.Y. Mar. 10, 2022)).

When formulating an RFC, an ALJ fails to develop the record if the ALJ does not "request a functional assessment when no such assessment exists in the record or when any such assessments are insufficient." *Jackson*, 588 F. Supp. 3d at 583. While not binding precedent, the Second Circuit has found that "remand is not always required when an ALJ fails in his duty to request opinions, particularly where, . . . , the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order). In *Tankisi*, the Court found the "sufficient evidence" standard to be met where the medical records were "extensive," "voluminous," and included "an assessment of [the claimant's] limitations from a treating physician." *Tankisi*, 521 F. App'x. at 34.

In *Guillen v. Berryhill*, however, the Second Circuit found that the ALJ failed to develop the record because, "[u]nlike *Tankisi*, the medical records obtained by the ALJ [did] not shed any light on Guillen's residual functional capacity, and the consulting doctors did not personally evaluate Guillen." *Guillen v. Berryhill*, 697 F. App'x 107, 108–09 (2d Cir. 2017) (summary order). "Although the treating physician rule has been abolished, the principle espoused by *Tankisi* still applies: whether remand is required because of failure to obtain an opinion from the

claimant's treating physician depends on whether the ALJ could have reached an informed decision based on substantial evidence without it." *Russ v. Comm'r of Soc. Sec.*, 582 F. Supp. 3d 151, 163 (S.D.N.Y. 2022).

Here, although the ALJ relied upon Maribeth N.'s clinical documentation, including imaging and notes from treating physicians, the opinions of a non-treating examining physician and two state agency medical consultants, and Maribeth N.'s description of her daily activities, the record is insufficient as to how her severe impairments impact her functional capacities.

  1. <u>Clinical Documentation and Medical Opinions</u>

In formulating his RFC determination, the ALJ noted that, during physical therapy, Maribeth N. "reported improvement in her symptoms since surgery and exercise of walking twenty minutes per day," and "her treating physical therapist noted that claimant 'shows functional improvement in response to therapy.'" Tr. at 23; *see also id.* at 386 ("[patient] with improved [symptoms] since surgery . . . and walking 20 mins"). Clinical notes demonstrate some quantifiable evidence of the "functional improvement" that Maribeth N.'s therapist notes. *Compare, e.g., id.* at 427 (On October 3, 2021, "Trunk Flexion 50%; Trunk Extension 20%; Trunk Side Bending-Left 25%; Trunk Side Bending-Right 40%."); *with id.* at 612 (On January 6, 2022 "Trunk Flexion 75%; Trunk Extension 55%; . . .Trunk Side Bending-Left 60%; Trunk Side Bending-Right 60%"); *and id.* at 645–46, 661 (on February 3, 2022, and March 14, 2022, "Trunk Flexion 80%; Trunk Extension 65%; Trunk Side Bending-Left 75%; Trunk Side Bending-Right 75%"); *but see id* at 687, 705 (On April 13, 2022, and May 11, 2022, slight decrease in "Trunk Extension" to "60%").

Those same records, however, likewise demonstrate that Maribeth N. experienced significant functional limitations as well. For example, her physical therapist noted that Maribeth

N.'s "functional restoration has yet to be attained." *Id.* at 464 ("Patient's functional restoration has yet to be attained, Patient's condition has potential to improve, Patient shows functional improvement in response to therapy."). In addition, while her physical therapist remarked that Maribeth N. "is making some significant improvements . . . including standing, household ambulation, and decreased muscle tightness," he noted, however, that "[l]imitations continue with sleeping, community ambulation, stair negotiation, lifting/carrying, bending/squatting, work activities, and household chores." *Id.* at 429; *see also id.* at 461 ("Continued pain with increased activity such as stairs and bending/squatting.").[12] Her treatment records include an explicit diagnosis of "difficulty in walking." *Id.* at 392 ("Treating diagnosis . . . Difficulty in walking").

The ALJ also found that "the lumbar MRI in June 2022 found no evidence of residual central canal or neural foraminal stenosis," and Maribeth N.'s "post-surgical examination findings. . . are largely normal and the claimant is never observed to appear uncomfortable or in distress by her treating medical providers during her examinations." *Id.* at 25. Maribeth N.'s clinical records, however, indicate that she continued to suffer back pain and presented new symptoms after her surgery. Weeks after her surgery, Dr. Spiro noted that while she experienced "improvement in the symptoms of the left lower extremity[,] [s]he has new symptoms of numbness/pain along the anterior thigh on the right lower extremity" and he advised her to "continue to walk as tolerated, avoid bending, twisting or lifting greater than 15 pounds." *Id.* at 358.

While her medical provider initially opined that "[t]hese symptoms are likely due to positioning during surgery, and should improve over time," Maribeth N.'s symptoms did not improve. As the ALJ noted, her medical providers observed "a 'sensory deficit present'

---

[12] It is not clear if these notes are observations from Maribeth N.'s self-reported experiences, or functional limitation assessments from her physical therapist.

described as 'decrease[d] appreciation of light tough on outer right lower leg'" consistent with Maribeth N.'s complaints of numbness in her right extremities. *Id.* at 24; *compare id.* at 351 (pre-surgery, "no sensory deficit" observed in June 2021), *with id.* at 358 (post-surgery, "[s]ensory deficit on the right lower extremity"), *id.* at 366 ("Sensory deficit on R anterior thigh" in Aug. 2021), *and id.* at 749 ("Sensory deficit present" in April 2022 appointment with Dr. Chozick); *but see id.* at 482 ("No sensory deficit noted" in Feb. 2022 evaluation with Dr. Weisman). In addition, as noted above, her physical therapist often observed that Maribeth N. continued to be "uncomfortable" during her sessions. *See, e.g., id*. at 610 ("General Observation[:] Uncomfortable. Worse with sedentary activity."); *id.* at 510 ("General Observation[:] Uncomfortable on the right side of the lumbar region."); *id.* at 597 ("General Observation[:] Uncomfortable"). In addition, in one of the most recent treatment records in her file, Dr. Spencer observed that Maribeth N. experienced "weakness in both legs and she feels unstable when rising from a seated position." *Id.* at 758.

As a result, it is unclear from the clinical records whether Maribeth N. has the functional capacities for light work, such as lifting up to 20 pounds, or the ability to conduct postural activities such as climbing stairs, kneeling, or stooping. *See* 20 CFR 404.1567(b) (Light work involves "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."). The failure to develop a clear record as to Maribeth N.'s postural capabilities is particularly important, given that the vocational expert, Ms. Paulson, testified that an individual who could not stoop, kneel, bend, crouch, or crawl could not perform the jobs listed at the hearing. *Id.* at 61–62. ALJ does not indicate how he determined that her walking twenty minutes a day and experiencing some relief permit her to stand or walk for four hours of an eight-hour workday and complete activities such as "frequently climb[ing] ramps and

stairs," observations that belie his RFC determination. *See id.* at 22; *see Mirna C. v. Kijakazi*, No. 3:21CV1296 (MPS), 2022 WL 4285694, at *5 (D. Conn. Sept. 16, 2022) (remanding where "the record here contains information about the diagnosis and treatment of the Plaintiff's physical impairments but does not contain any information as to how those ailments affect her ability to perform the physical demands of work. None of Plaintiff's providers or examining consultants assessed her physical capacity to perform work-related activities, nor is such information contained in the medical records."); *Cheryl W. v. Kijakazi*, No. 3:22-CV-1476 (VAB), 2024 WL 1012923, at *6 (D. Conn. Mar. 8, 2024) ("Given the significance of resolving this important issue, whether Cheryl W. can 'frequent[ly] lift[ ] or carry[ ] objects weighing up to 25 pounds' and lift 'no more than 50 pounds[,]' and the absence of any record evidence, the ALJ's decision as to Cheryl W.'s RFC cannot be affirmed.").

In fact, Dr. Weisman, the only medical professional to provide an opinion following an actual examination of Maribeth N., found that while she was able to walk unassisted, and was not in "acute distress," Maribeth N. was "unable to perform postural activity" and "unable to carry any weight on a frequent basis," though she was "able to lift or carry 10 lb occasionally." Tr. at 481, 483; *see also id.* at 418 ("Unable to squat. . . . Unable to mount or dismount exam table without assistance. Unable to rise from chair without difficulty."). The ALJ ultimately found that Dr. Weisman's opinion was unpersuasive because he did not review Maribeth N.'s medical records. *Id.* at 26.

While the ALJ relied upon the opinions of state agency medical consultants, which he credited as "somewhat persuasive," these opinions, which rely on an incomplete record, and, at times, are inconsistent with Maribeth N.'s treatment notes, are likewise an insufficient basis for the ALJ's RFC determination. *See Martinez v. Saul*, No. 3:19-CV-01017-TOF, 2020 WL

6440950, at *8 (D. Conn. Nov. 3, 2020) ("[O]pinions by non-examining consultants cannot fill the gap created by the absence of treating physician opinions when the medical records 'do[ ] not provide a sufficient basis' to determine a claimant's RFC. Courts have held that '[r]emand is ... necessary' under these circumstances." (quoting *Borelli v. Berryhill*, No. 3:18-CV-0801 (VLB), 2019 WL 4233586, at *13 (D. Conn. Sept. 6, 2019) and *Martinez v. Berryhill*, No. 3:17-CV-0843 (SRU), 2019 WL 1199393, at *11 (D. Conn. Mar. 14, 2019)).

Dr. Thommen noted that Maribeth N. "continu[es] to improve per most recent [Medical Evidence Record]" as well as her "normal . . . gait [post-op] and improved [symptoms]." Tr. at 71; *compare id.* at 351 (noting "antalgic gait" pre-surgery on June 3, 2021), *with id.* at 358, 365–66, 372–73 ("no antalgic gait" post-surgery on July 19, 2021, August 16, 2021, and August 25, 2021). Dr. Bennett, who noted Maribeth N.'s May 2022 CT scan showing "no osseous fusion of the endplates" determined that "[a]lthough she has [claims of] persistent pain, [her] exams show no evidence of nerve root compression and recent MRI of L spine shows no disc herniation, canal or foraminal stenosis, or complication from her procedure. She has a normal gait on recent exams." *Id.* at 77, 80; *see also id.* at 743 ("Vertebral levels show no disc herniation, canal or foraminal stenosis seen").

While at her appointments with Dr. Chozick and Dr. Spiro in May and July 2022, she presented with a "normal gait," Tr. at 752, 762, Maribeth N.'s treatment notes from March and April 2022, however, observed that she sometimes had a "[p]oor gait pattern" and "demonstrate[d] increased tenderness" during physical therapy. *Id.* at 667, 684. In addition, although Dr. Thommen opined that Maribeth N. could "frequently" kneel, and Dr. Bennett concluded that Maribeth N. had "unlimited" functionality to kneel, *id*. at 71, 69, her physical

therapist noted that Maribeth N. experienced "weakness with half kneel to stand function test." *Id.* at 390.

Finally, while the ALJ, considered "additional medical evidence received after [Drs. Thommen and Bennett's] assessments and . . . the claimant's subjective complaints" to "find that the evidence supports greater limitation in stand/walk, slightly different postural limitations, and an environmental limitation regarding unprotected heights as included in the above residual functional capacity finding," *id*. at 26, in the absence of credible opinions or treatment notes opining on Maribeth N.'s RFC, the ALJ failed to adequately develop the record to determine her RFC. *See Guillen*, 697 F. App'x at 108–09 ("Unlike *Tankisi*, the medical records obtained by the ALJ do not shed any light on Guillen's residual functional capacity, and the consulting doctors did not personally evaluate Guillen."); *Mirna C.*, 2022 WL 4285694, at *4 ("Although he points to 'notations [in the record]' showing '5/5 strength at her extremities,' and normal gait and station, the ALJ does not explain how clinical findings regarding muscle strength and gait assessed in a physical exam support his determination that the Plaintiff is able to walk and/or stand for four hours, especially in light of the record evidence and the ALJ's own finding that the Plaintiff required the use of a cane."); *but see Blachorsky v. O'Malley*, No. 23-CV-07401 (VF), 2024 WL 4144040, at *10 (S.D.N.Y. Sept. 11, 2024) (affirming ALJ's RFC determination that "was supported by the opinions of . . . a consultative examiner, and two non-examining consultative physicians" and "the ALJ . . . crafted an RFC that was far more restrictive than the medical opinions found necessary" where the evidence otherwise supported the ALJ's RFC assessment).

2. <u>Maribeth N.'s Daily Activities</u>

The ALJ also found that Maribeth N.'s "functional activities as documented in the record, are significantly greater than she asserted during her testimony at the hearing," because she reported that she babysits her three-months-old and three-year-old nieces, "plays games on her phone, utilizes the internet and keeps in contact with friends on the internet, watches TV, makes meals with her mother, drives on occasion, goes grocery shopping, sees family and friends[,]" and "was able to travel round-trip from her home in Connecticut to Buffalo, New York over the Christmas holiday." *Id.* at 25

"In formulating an RFC, the ALJ is of course entitled to consider 'descriptions and observations' made by a claimant about her own limitations." *Vecchitto v. Saul*, No. 3:19-CV-00726-TOF, 2020 WL 4696791, at *7 (D. Conn. Aug. 13, 2020) (quoting 20 C.F.R. § 416.945(a)(3)). "Reports of these daily activities, however, must 'offer insight on how plaintiff's impairments affect her ability to work and undertake activities of daily life.'" *Id.* (quoting *Keovilay v. Berryhill*, No. 3:19-CV-0735 (RAR), 2020 WL 3989567, at *4-5 (D. Conn. Jul. 15, 2020) (finding "there was not an obvious gap in the record although there were no opinions from plaintiff's treating sources examining her physical limitations" because claimant "admitted to her physicians that she walks her dog for up to an hour in the morning and an hour at night, walks three to four times a week, performed household chores, . . . cared for her boyfriend's disabled mother[, and] moved in with her mother to care for puppies that had just been born.")); *see also Schillo v. Kijakazi*, 31 F.4th 64, 78 (2d Cir. 2022) ("Schillo's testimony about her daily activities—including her ability to do chores around her house, bathe, dress, and use her cellphone—lends some support to the ALJ's findings that both Drs. Shukri's and Picciano's opinions are inconsistent with the objective medical evidence.").

25

Courts have remanded, however, where the claimant's daily activities "do not speak to the [her] capacity to perform 'light work' or the functional limitations caused by her physical impairments." *Vecchitto*, 2020 WL 4696791, at *7 ("nothing about the Plaintiff's 'cooking for large events and cleaning/organizing her home' supports the conclusion that she can lift twenty pounds and frequently lift and carry ten."); *Newton v. Berryhill*, No. 3:18-CV-1244 (MPS), 2019 WL 4686594, at *4 (D. Conn. Sept. 26, 2019) ("Mr. Newton's statements that he performs self-care, tries to help out with his grandson when his daughter works, drives his grandson to work a few times a week, prepares light meals, sweeps, and goes for short walks. . . does not constitute substantial evidence that his functional abilities are in excess of those alleged, and in any event do not support specific findings that he can stand or walk for two hours per work day and lift up to 20 pounds."); *Colgan v. Kijakazi*, 22 F.4th 353, 363 (2d Cir. 2022) ("we disagree with the ALJ that Colgan's ability to engage in certain activities of daily living—such as caring for her two children, preparing meals and washing dishes, and driving to her medical appointments— provided substantial record evidence to discount Dr. Ward's medical opinion."); *id.* ("[W]hen a disabled person gamely chooses to endure pain in order to pursue important goals, such as attending church and helping his wife on occasion go shopping for their family, it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working." (quoting *Balsamo v. Chater*, 142 F.3d 75, 81–82 (2d Cir. 1998)).

In formulating his RFC assessment, ALJ emphasized Maribeth N.'s five-hour trip to Buffalo over the Christmas holidays, which she reported worsened her symptoms, *see* Tr. at 606 ("[Patient] reports more pain in the back after traveling to Buffalo for Christmas."), and her claim that "on a typical day she babysits her three-months-old niece when her sister drops her

off," and that "she also provides care for her three-year-old niece when her niece is not in school." *Id.* at 476. Maribeth N. also reported that, on at least one occasion, babysitting her three-year-old niece worsened her symptoms. *Id.* at 414 ("[Patient] reports she had to stop her niece from driving a power wheels into the street causing increased back pain for the past couple of days."). Maribeth N. did not mention these activities during the hearing before the ALJ, and no further information regarding the frequency or intensity of these activities are included in the record.

The ALJ does not explain how short notes regarding a trip to Buffalo and caring for young children supports the assessment that Maribeth N. is capable of standing or walking for four hours in an eight-hour workday or lifting up to twenty pounds. For example, it is unclear if Maribeth N. watched her nieces alone or with the assistance of her parents, how often and for how long she would watch them, and what activities she would do when watching them. Likewise, the record is unclear as to whether she required breaks during her trip to Buffalo, or the level of discomfort she felt during that trip. *See Blackert v. Berryhill*, No. 3:16-CV-1327 (JCH), 2017 WL 3168580, at *7 (D. Conn. July 26, 2017) (concluding "evidence [of plaintiff's daily activities] is of little probative value without knowing more details about the activities. Did she lift heavy suitcases while traveling, or chop up firewood while camping? Does her nightly exercise regime involve bench pressing fifty or more pounds? In sum, while these activities may indicate that Blackert is capable of some degree of physical exertion, they say almost nothing about her capacity to perform medium work.")

Clearly, had Maribeth N. been more forthcoming at the hearing, the ALJ would have been afforded an opportunity to further probe these activities. *See* Tr. at 46 ("Q Have you left the State of Connecticut for any reason even for one day since July of 2021? A No."). Regardless,

27

while the ALJ has the discretion to consider inconsistencies in Maribeth N.'s testimony when evaluating her credibility, *see Wavercak v. Astrue*, 420 F. App'x 91, 94 (2d Cir. 2011) ("In reviewing this challenge, we note that '[i]t is the function of the [Commissioner], not ourselves, ... to appraise the credibility of witnesses, including the claimant.'" (quoting *Carroll*, 705 F.2d at 642 (alterations in original))), without more information regarding these activities and whether such activities involved similar functional capacities to those demanded in the workplace, the ALJ had to speculate as to the relevance of these daily activities on Maribeth N.'s RFC.

Accordingly, without more information as to the exertion and frequency of these activities, on this record, the ALJ lacked a sufficient basis to use these activities in formulating Maribeth N.'s RFC. *See Blackert*, 2017 WL 3168580, at *7 (concluding that "a trip to Florida, going out to dinner, going camping with her boyfriend once, exercising, and completing chores . . . [was] of little probative value without knowing more details about the activities."); *Bridget P. v. Comm'r of Soc. Sec.*, No. 3:21-CV-654 (CFH), 2023 WL 2402782, at *18 (N.D.N.Y. Mar. 8, 2023) (concluding that the "plaintiff's ability to 'tak[e] care of her ill husband, walk[ ] her child from school, cook[,] and clean[ ]'" did not "indicate that plaintiff would be more likely to tolerate sitting at a job for roughly six hours a day with occasional walking or standing—as required for sedentary work—or would be able to show up to work for the number of requisite days."); *Claudio-Montanez v. Kijakazi*, No. 21-2027, 2022 WL 17819123, at *4 (2d Cir. Dec. 20, 2022) ("Claudio-Montanez's activities in caring for her mother—including cleaning, sweeping, washing dishes, doing laundry, driving her to medical appointments, and dispensing medications—are not incompatible with the restrictions Dr. Hogan and others identified, as those restrictions relate to the need for positional changes, and to elevate her feet, rather than

exertional limitations. In addition, Claudio-Montanez cared for her mother for an average of eighteen hours per week, which is far less than a forty-hour full-time work schedule.").

      3.  <u>Additional Gaps in the Record</u>

Finally, while "ALJ's duty to develop the record is not 'infinite,'" *Tatelman v. Colvin*, 296 F. Supp. 3d 608, 612 (W.D.N.Y. 2017) (internal citation omitted), there are two additional areas that remain unclear from the overall treatment records which may directly impact Maribeth N.'s RFC.

First, Maribeth N. reported that after receiving lumbar epidural steroid injections, she experienced "4 days of 90% pain relief" after the injection, but then her pain returned. Tr. at 831. Dr. Spiro subsequently modified her pain management regimen to include a morning dosage of gabapentin in addition to her dosage at night, *id.*, and Maribeth N. reported that days before the hearing, after being switched from gabapentin to Lyrica, she experienced an adverse reaction that left her hospitalized. *Id.* at 42–43. Before her surgery, Maribeth N. frequently called out of work four times a week due to her pain symptoms, *id.* at 47–48, and vocational expert Ms. Paulson testified that if an individual with Maribeth N.'s RFC determination was off-task 15% of the time or absent from work (including arriving late) more than two times per month, there would be no jobs she could perform. *Id.* at 60–61. As a result, there is a gap in the record regarding Maribeth N.'s response to her revised pain management treatment and its impact on her ability to stay on task and consistently arrive at work—information that is highly relevant to her ability to sustain gainful employment.

In addition, Maribeth N. indicated at the hearing that Dr. Chozick advised her to undergo "corrective surgery." *Id.* at 50. She further indicated that, on January 26, 2023, approximately two weeks after the hearing, she had an appointment with Dr. Chozick to discuss the schedule for

her corrective procedure. *Id.* at 50, 54 ("Q Do you have any idea moving forward when Dr. Chozick is going to be doing the corrective procedures that are necessary? A No. Q Okay, that's one of the reasons you're going to see him to find out what's on the schedule moving forward? A Correct."). Her latest treatment record with Dr. Chozick in the record from June 17, 2022, however, does not mention this corrective surgery. *See id.* at 757. While the ALJ allowed thirty days for Maribeth N.'s counsel to submit additional records, Maribeth N. failed to submit additional records from Dr. Chozick. Records of her corrective surgery, and the reasons Dr. Chozick determined such surgery to be medically necessary, as well as any subsequent improvement in her symptoms after the corrective surgery was performed, is relevant to determining Maribeth N.'s RFC.

************

Accordingly, because the ALJ's RFC assessment is, at best, not clearly supported, and, at worst, belied by Maribeth N.'s treatment notes, the ALJ failed to adequately develop the record and remand is warranted. *Edwards v. Comm'r of Soc. Sec. Admin.*, No. 22-CV-4345 (RWL), 2023 WL 6173526, at *17 (S.D.N.Y. Sept. 22, 2023) ("Courts have remanded in cases where, absent a treating source opinion, an ALJ . . . relied on . . . an incomplete or ambiguous record, or the underlying treatment record suggested much more significant limitations than opined.").

On remand, the ALJ should request an additional opinion from a medical professional—either a treating physician, or consulting physician—who personally evaluates Maribeth N., can more clearly discuss how her medical conditions and symptoms impact her work-related functionalities, and who has obtained and reviewed any records relating to any corrective surgery Maribeth N. received or is anticipated to receive.

### B.  Remaining Arguments

Maribeth N. also argues that the ALJ's opinion was not supported by substantial evidence because the ALJ "improperly characterized the plaintiff's daily activities as being evidence that her functional capacity was 'significantly greater than asserted, and therefore improperly relied upon daily activities in formulating the plaintiff's residual functional capacity" and that the objective and clinical evidence supports her allegations of chronic pain. Mem. at 11.

Because the Court has determined that remand for further administrative proceedings is necessary, however, the Court declines to reach this issue. *Alvarez v. Comm'r of Soc. Sec.*, No. 14-CV-3542 MKB, 2015 WL 5657389, at *18 (E.D.N.Y. Sept. 23, 2015) ("Where, as here, an ALJ fails to adequately develop the record in reaching a conclusion on a claimant's residual functional capacity, the Court is unable to review whether the ALJ's denial of benefits was based on substantial evidence."); *see also Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

## IV.    CONCLUSION

For the reasons explained above, Maribeth N.'s motion is **GRANTED** and the Commissioner's motion is **DENIED**.

The decision of the Commissioner is **VACATED** and **REMANDED** for rehearing and further proceedings in accordance with this Ruling and Order.

The Clerk of Court is respectfully directed to close the case.

**SO ORDERED** at New Haven, Connecticut, this 7th day of February, 2025.

        */s/ Victor A. Bolden*
        Victor A. Bolden
        United States District Judge

31